FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MAR 2 3 2015

SEAN F. McAVOY, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

1  Richard C. Eymann, WSBA #7470
   EYMANN ALLISON HUNTER JONES P.S.
2  2208 W. Second Avenue
   Spokane, Washington  99201
3  Telephone:  (509) 747-0101
   Facsimile:  (509) 458-5977
4  E-mail:  eymann@eahjlaw.com

5  Hugh P. Lambert, *Pro Hac Vice Pending*
   Emily C. Jeffcott, *Pro Hac Vice Pending*
6  Cayce C. Peterson, *Pro Hac Vice Pending*
   Chathan S. Mangat, *Pro Hac Vice Pending*
7  THE LAMBERT FIRM, PLC
   701 Magazine Street
8  New Orleans, Louisiana  70130
   Telephone:  (504) 581-1750
9  Facsimile:  (504) 529-2931
   E-mail:  hlambert@thelambertfirm.com
10          ejeffcott@thelambertfirm.com
            cpeterson@thelambertfirm.com
11          cmangat@thelambertfirm.com

12 *Attorneys for Relator*

13            **UNITED STATES DISTRICT COURT**
              **EASTERN DISTRICT OF WASHINGTON**

14

| | |
|---|---|
| UNITED STATES OF AMERICA *EX REL.* JAMES MILLBAUER, RELATOR, VS. CH2M HILL PLATEAU REMEDIATION COMPANY, DEFENDANT. | NO. **2:15-CV-5024-EFS** **ORIGINAL COMPLAINT** **FILED UNDER SEAL** DEMAND FOR JURY TRIAL |

15

16

17

18

19

20

21 Original Complaint                    1

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ALLEGATIONS .................. 5

II.     PARTIES ........................................................................... 6

III.    JURISDICTION AND VENUE............................................... 7

IV.     FACTUAL ALLEGATIONS.................................................... 8

    A.      Background ............................................................. 8

    B.      CHPRC Purposely Avoided Implementing Required Asbestos
        Control Methods in Demolishing     Hanford Site Ancillary
        Buildings and Structures. ............................................... 11

        1.      U Plant Ancillary Buildings....................................... 13

        2.      272E Fabrication Shop............................................. 17

        3.      284E Powerhouse, 284W Powerhouse, and 284WB Power
            Boiler Plant............................................................. 21

        4.      209E Laboratory...................................................... 26

    C.      Inspections Reveal CHPRC Violated Asbestos Control
        Requirements at Other Demolition Sites. ....................... 30

D.    **EPA and Ecology Instruct CHPRC to Stop Work and Cease Use of the AACM.** .................................................................. **31**

**COUNT I** .................................................................................. **32**

V.    **JURY REQUEST** .................................................................. **34**

VI.    **PRAYER FOR RELIEF** ...................................................... **34**

1

2                              **ACRONYMS**

3   AACM        Alternative Asbestos Control Method

4   ACM         Asbestos Containing Material

5   AHERA       Asbestos Hazard Emergency Response Act

6   ARRA        American Recovery and Reinvestment Act of 2009

7   CAB         Cement Asbestos Board

8   CHPRC       CH2M Hill Plateau Remediation Company

9   D4          Decontamination, Deactivation, Demolition and Decommissioning

10  D&D         Deactivation & Decommissioning

11  DOE         United States Department of Energy

12  EPA         United States Environmental Protection Agency

13  FWS         Field Work Supervisor

14  NESHAP      National Emission Standards for Hazardous Air Pollutants

15  PACM        Presumed Asbestos Containing Material

16  PBI         Performance-Based Incentives

17  RACM        Regulated Asbestos Containing Material

18  TSI         Thermal System Insulation

19  WBS         Work Breakdown Structure

20

21  Original Complaint                    4

## I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.   This is an action to recover damages, civil penalties, and other relief from Defendant CH2M Hill Plateau Remediation Company ("CHPRC") arising from fraud on the United States Department of Energy ("DOE") during the removal of asbestos containing material ("ACM") from obsolete structures at the Hanford Site.

2.   As explained in detail below, DOE awarded CHPRC hundreds of millions of dollars in American Recovery and Reinvestment Act of 2009 ("ARRA") funds to demolish and dispose of decommissioned ancillary facilities and structures at the Hanford Site.

3.   To provide fast economic relief following the Great Recession, ARRA imposed strict expenditure deadlines, requiring CHPRC and its subcontractors to spend ARRA funds by the end of 2011 or risk losing the funds.

4.   With time limited, CHPRC elected to tear down decommissioned Hanford facilities without properly removing ACM.   In doing so, Defendant knowingly violated contractual and regulatory requirements critical to the safe handling and disposal of ACM.

5.   Defendant falsely certified compliance with these requirements in order to obtain payment from the government.

Original Complaint                      5

6.    As a result of Defendant's violations and false certifications, Defendant defrauded the government out of millions of dollars in falsely claimed performance based incentive fees.

7.    Had Defendant complied with contractual and regulatory requirements, Defendant would have been unable to meet deadlines for ARRA funding and performance-based incentives, which would have resulted in the irrevocable loss of millions of dollars in fees.

## II.    PARTIES

8.    Defendant CH2M Hill Plateau Remediation Company ("CHPRC") is the prime government contractor for DOE under the Plateau Remediation Contract. CHPRC's contractual responsibilities include deactivation and demolition of Hanford site ancillary facilities and support structures.

9.    CHPRC is a limited liability company incorporated under the laws of the state of Washington with its principal business address located at 2420 Stevens Center Place, Richland, WA 99354.    Defendant CHPRC may be served with process through its registered agent for service, C T Corporation System, at 505 Union Avenue SE, Suite 120, Olympia, Washington 98501.

10.    Relator James "Jim" Millbauer has been employed at the Hanford site working primarily as a pipefitter since 1983.    Relator Millbauer is currently the Chief Steward for Local Union 598 Metal Trades at Mission Support Alliance.

11. Relator Millbauer has direct and independent knowledge of the information underlying his claims as set forth in this Original Complaint, and he voluntarily provided all such information to the United States Government before its filing.

### III.    JURISDICTION AND VENUE

12. This action arises under the United States False Claims Act, 31 U.S.C. § 3729 *et seq.*

13. This Court has jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

14. Venue is proper with respect to all parties in the United States District Court for the Eastern District of Washington pursuant to 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because Defendant transacts business in this District, and because Relator, during all times material to this matter, was employed in this District.

15. There was not, prior to filing the Original Complaint in this case, any "public disclosure" of the false claims identified herein as that term is used in the False Claims Act, 31 U.S.C. § 3730(e)(4)(A). However, even if a "public disclosure" has occurred, the information provided by Relator Millbauer to the United States Government materially adds to publically disclosed allegations and transactions, if any. As such, Relator Millbauer is an "original source" of the

information underlying and becoming Relator's false claims identified herein, and

Relator's claims are not barred pursuant to 31 U.S.C. § 3730(e)(4)(B).

IV.    **FACTUAL ALLEGATIONS**

A.    **Background**

16.    CHPRC was awarded the Hanford Site Plateau Remediation Contract

on June 19, 2008, a cost-plus award fee contract valued at approximately $4.5

billion over ten years.

17.    As part of its contractual scope of work, CHPRC is required to

decontaminate, deactivate, decommission, and demolish ("D4 activities") hundreds

of ancillary buildings and structures at the Hanford Site.

18.    In addition to obtaining reimbursement for the cost of performing the

work, the Plateau Remediation Contract provides CHPRC the opportunity to claim

millions of dollars in performance-based incentive ("PBI") fees upon concluding

the required scope of work.  CHPRC earns these PBI fees after it certifies to DOE

that it has completed D4 activities in accordance with the Plateau Remediation

Contract.

19.    The Plateau Remediation Contract also specifies that the ancillary

buildings and structures–many of which housed utilities, materials, and equipment

necessary for the overall operation of Hanford–may contain radioactive and

hazardous materials, including asbestos.

20.    To address this, CHPRC issued several demolition plans with specific requirements pertaining to asbestos removal:

a)    U Plant Ancillary Building Removal Action Work Plan, Phase II, DOE/RL-2004-83, Rev. 1, December 18, 2008;

b)    Action Memorandum for General Hanford Site Decommissioning Activities, DOE/RL-2010-22, Rev. 0, March 29, 2010;

c)    Removal Action Work Plan for Central Plateau General Decommissioning Activities, DOE/RL-2010-33, April 9, 2010;

d)    U-Ancillary Buildings 224-U, 224-UA and 203-UX Demolition Strategy White Paper, April 2010;

e)    Action Memorandum for Decontamination, Deactivation, Decommissioning, and Demolition (D4) Activities for 200 East Tier 2 Buildings/Structures, DOE/RL-2010-102, February 2, 2011.

21.    These "demolition plans" were approved by DOE's Richland Office, EPA Region 10 ("EPA"), and the State of Washington Department of Ecology ("Ecology").

22.    Each of the demolition plans required that CHPRC adhere to the substantive provisions of 40 C.F.R. § 61, Subpart M (§§ 61.140 – 61.157), National Emission Standard for Asbestos, which mandates special precautions to control airborne emissions of asbestos fibers during asbestos removal activities.

23.    In particular, subsection (c) of the Standard for Demolition and Renovation, 40 C.F.R. § 61.145, requires that all regulated asbestos-containing (referred to herein as "RACM" or "asbestos") material be removed from a building prior to beginning any activity that would break up, dislodge, or disturb the material.    This provision minimizes the emission of asbestos fibers from demolition activities by preventing heavy equipment or explosives from pulverizing the RACM and dispersing it by air, which increases the likelihood of human ingestion or inhalation of the fibers.

24.    The demolition plans also authorized CHPRC to proceed with demolition with RACM in place in limited circumstances.    Specifically, where RACM containing material was inaccessible, removal posed significant worker safety issues, the building was structurally unsound or in danger of imminent collapse, or removal required initiation of demolition activities, CHPRC was permitted to employ emission controls similar to EPA's Alternative Asbestos Control Method ("AACM"), EPA/600fR-08/094.

25.    Under the AACM approach, a structure must be continuously wetted before, during and after demolition; tank, pipe, elbow/fitting/valve, boiler, and duct insulation must be removed; cement and patching compounds as well as spray-applied fireproofing and vermiculite insulation must be removed; and all debris

must be removed from the work site at the end of the work day and transported to an appropriate disposal facility.

26.    CHPRC did not have to obtain prior approval from DOE, EPA, or Ecology to deviate from 40 C.F.R. 61 requirements and employ AACM.  Instead, CHPRC only had to notify DOE, EPA, and Ecology of its intention to use the AACM approach.

**B.**    **CHPRC Purposely Avoided Implementing Required Asbestos Control Methods in Demolishing  Hanford Site Ancillary Buildings and Structures.**

27.    From 2009 to 2011, CHPRC misrepresented to DOE the extent of RACM in Hanford Site ancillary buildings and structures and exaggerated the danger its removal posed to workers in order to falsely validate the use of AACM.

28.    As detailed below, CHPRC subsequently failed to implement the AACM controls that were required by the demolition plans approved by DOE, EPA, and Ecology to accelerate D4 activities and meet performance award fee deadlines.

29.    Specifically, CHPRC falsely certified to DOE that it complied with its demolition plans in tearing down the following groups of buildings in order to claim performance award fees to which it was not entitled:

a)    224U  U  Plant  Concentration  Building,  224UA  U  Plant Calcination  and  Loadout  Building,  and  203UX  Concentrated  U  Plant Storage  Tank  Enclosure  (collectively  referred  to  herein  as  "U  Plant Ancillary Buildings");

b)    272E Fabrication Shop;

c)    284E  Power  House,  284W  Power  House,  and  284WB  Power Basin Plant; and

d)    209E Critical Mass Laboratory.

30.    CHPRC's  uncontrolled  demolition  activities  endangered  worker health  and  safety  and  caused  the  release  of  asbestos  containing  material  into  the environment.

31.    In 2012, after receiving reports of CHPRC's dangerous work practices from  Relator  Millbauer  and  others,  the  Region  10  EPA  Director  issued  a  Stop Work order on all Hanford Site activities that could disturb or break up asbestos.

32.    Subsequent  inspections  determined  that  the  demolition  work conducted by CHPRC created an additional 35 sites where asbestos was released or  suspected  to  have  been  released  to  the  soil,  thereby  costing  the  Government additional investigation and remediation expenses.

1

### *1.    U Plant Ancillary Buildings*

2      33.    To earn a performance base fee of approximately $1.1 million,

3 CHPRC was required to "demolish and dispose" of the U Plant buildings by

4 September 30, 2011 in accordance with the U-Plant Ancillary Facilities Removal

5 Action Work Plan, DOE/RL-2004-83, Rev. 1.

6      34.    As permitted by the Removal Action Work Plan, CHPRC developed a

7 white paper validating its planned use of AACM.

8      35.    In this white paper, CHPRC detailed the control strategies it planned

9 to implement to minimize asbestos exposure to the environment, and represented

10 to DOE, EPA, and Ecology that "[w]hen RACM is encountered during the

11 demolition process, the surrounding material will be removed to the greatest extent

12 possible, to allow clearer access to the RACM.  Once accessible, the RACM will

13 be extracted and packaged as required, minimizing damage."

14      36.    Nevertheless, CHPRC demolished the U Plant Buildings in 2010 and

15 2011 without extracting and packaging easily removable RACM.

16      37.    Rather, CHPRC knowingly misrepresented to DOE that RACM in

17 certain areas was inaccessible, disregarding worker concerns, and reneging on

18 promises to abate the asbestos prior to demolition.

19

20

21

1      38.    In September and October of 2009, CHPRC management, safety

2   representatives, and workers performed a walk down of the U Plant Buildings in

3   advance of demolition.

4      39.    During the walk down, workers questioned whether removable

5   RACM behind "Hot Boxes" would be abated prior to demolishing the U Plant

6   Buildings–an activity the workers believed could be easily done with minimal risk

7   to safety.

8      40.    CHPRC management initially told workers that the RACM would be

9   removed prior to demolition, but never provided instruction to move the Hot Boxes

10  and abate the exposed RACM.

11     41.    To address the issue, insulators—workers specialized in the removal

12  of asbestos—explained to CHPRC management in March 2010 meetings that the

13  Hot Boxes could be easily moved, providing access to abate the RACM.

14     42.    CHPRC management rejected the insulators' position. Instead, in May

15  2010, CHPRC notified EPA, Ecology, and DOE that it planned to demolish the U

16  Plant Buildings with RACM left in place.

17     43.    CHPRC claimed that 3570 pounds of RACM and 8500 ft$^2$ of ACM

18  were inaccessible because manual removal posed a significant risk of worker

19  injury "due to the necessity to remove larger heavy equipment and building

20  structural components."

21
Original Complaint                    14

44.    Once demolition was underway in summer 2010, workers informed CHPRC management that large pieces of calciners extracted from the 224UA Building were covered with visible RACM.

45.    CHPRC took no action to timely package the asbestos or to minimize asbestos exposure from the calciners, which remained on the ground of the demolition site of the U Plant Buildings for an extended period of time.

46.    Indeed, during the demolition of the U Plant Buildings, CHPRC did not use workers specialized in the removal of asbestos except to clean up a substantial asbestos spill, despite the fact that CHPRC was explicitly required to disposition all demolished RACM on a timely basis.

47.    Specifically, CHPRC's demolition strategy white paper specified that "[a]ll structure debris handled and packaged as RACM will be dispositioned in a timely manner to minimize the amount of RACM exposed to the environment. RACM debris will be [contained and labeled as required by NESHAP] as soon as practical after removal of the material from the structure."

48.    Throughout demolition activities, CHPRC allowed the asbestos debris to sit, uncovered, on the ground of the demolition site for extended periods of time when the debris could have been easily gathered on a daily basis.

49.    Workers took issue with CHPRC's practice of leaving exposed RACM debris on the demolition site, and also raised concerns with CHPRC's

1    practice of running over exposed RACM debris with heavy machinery, such as

2    back hoes, etc.

3        50.    By not regularly picking up asbestos debris and then crushing it with

4    heavy machinery, CHPRC exacerbated the breakage of asbestos in contravention

5    of the AACM approach, and increased the likelihood of human inhalation or

6    ingestion of asbestos fibers and dispersal in the environment.

7        51.    Despite representing to DOE, EPA, and Ecology that it would employ

8    the AACM controls provided in its demolition strategy white paper, CHPRC cut

9    corners and ignored necessary controls that would have limited asbestos exposure

10   in order to speed up demolition activities and meet deadlines for performance fee

11   awards.

12       52.    CHPRC then falsely certified to DOE that it demolished the U Plant

13   Ancillary Buildings in compliance with the Removal Action Work Plan and

14   demolition strategy white paper in order to obtain the $1.1 million performance

15   award fee associated with demolition activities.

16       53.    As a result of CHPRC's failure to properly remediate the area, the

17   Government has incurred additional costs to control the migration of asbestos

18   containing materials from the demolition sites and prevent further environmental

19   exposure.

20

21

1

### 2.    272E Fabrication Shop

2    54.    Just as with the U Plant Buildings, CHPRC also cut corners in

3    applying the AACM approach to the 272E Fabrication Shop, which was largely

4    demolished in the summer of 2010.

5    55.    To earn a performance based fee of approximately $230,000, CHPRC

6    was required to demolish four buildings, including the 272E Fabrication Shop, by

7    September 30, 2011 in accordance with the Removal Action Work Plan for

8    Central Plateau General Decommissioning Activities ("Central Plateau Work

9    Plan"), DOE/RL-2010-33, Rev. 0.

10    56.    However, CHPRC demolished the 272E Fabrication Shop without

11    implementing key AACM controls promised to DOE, EPA, and Ecology in

12    CHPRC's Central Plateau Work Plan, such as:

13        a)    "Building/structures to be demolished with RACM remaining

14        will be thoroughly and adequately wetted with amended water (water to

15        which a surfactant has been added) prior to demolition, during demolition

16        and during debris handling and loading.  To the extent feasible, cavity areas

17        and interstitial wall spaces will be wetted.  A fixative or sealant such as

18        'lockdown' may be used to reduce the potential for fiber and dust generation

19        during the demolition process.  Additionally, fixative or sealant will be used

20        on demolition debris that will remain undisturbed for greater than 24 hours;"

21

1              b)    "Breakage of ACM will be minimized, to the extent practical,

2 and ACM debris generated during that day will be containerized for

3 disposal;"

4              c)    "The 'National Emission Standards for Hazardous Air

5 Pollutants' (NESHAPs) asbestos standard of 'no visible emissions' from

6 RACM or ACM will be employed;"

7              d)    "Potentially contaminated water will be controlled during

8 demolition, impervious surfaces will be thoroughly washed with water

9 following completion of the asbestos-related activities;"

10             e)    "Upon the removal of demolition debris, bare soil within the

11 asbestos-related demolition area will be excavated to a minimum depth of

12 7.64 cm (3 in.) or until no debris is found. If berms or other run-off controls

13 were used to contain water, they will be removed and disposed of as

14 potentially asbestos-contaminated."

15    57.    Despite its obligation to minimize asbestos debris, CHRPC took few

16 measures to prevent unnecessary asbestos exposure during and after demolition

17 activities.

18    58.    For instance, CHPRC did not provide adequate wetting during

19 demolition activities. Video taken during the demolition of the 272E Fabrication

20 Shop shows that CHPRC's exterior wetting process did not reach all of the areas

21

Original Complaint                 18

1    being demolished, allowing visible emissions to frequently escape the demolition

2    site.

3         59.    In addition, CHPRC failed to close off drains within the 272E

4    demolition site, which allowed RACM debris to gather and clog drains beyond the

5    site boundary during demolition activities.

6         60.    As with other demolition sites, CHPRC also failed to pick up asbestos

7    debris on a timely basis, operated heavy machinery which further broke up the

8    exposed asbestos debris, and did not clear away three inches of soil at the 272E

9    demolition site.

10        61.    Consequently, significant amounts of possible RACM remained on-

11   site after demolition.

12        62.    Nevertheless, by late 2011 CHPRC represented to DOE that 272E site

13   activities were complete and all asbestos debris on-site had been removed and

14   packaged.

15        63.    Contrary to CHPRC's representation, exposed asbestos debris

16   remained on and around the 272E site after CHPRC's supposed completion of all

17   removal activities.

18        64.    Relator Millbauer recalls observing dry chunks of RACM, which were

19   left in the field in and near the demolition sites, in violation of AACM

20   requirements for debris handling and removal.

21

65.   In fact, workers were compelled to issue a Stop Work upon observing broken pieces of concrete asbestos boards near the 272E site, which they attributed to CHPRC's use of the AACM during demolition of the 272E Fabrication Shop.

66.   To resolve the Stop Work, CHPRC agreed to conduct an inspection of all sites demolished using AACM including the 272E site.

67.   For the 272E demolition site, the inspection team identified RACM scattered within the identified perimeter as well as outside the boundary.  The team noted that other industrial hazards remained at the demolition site, including unlevel concrete, rebar sticking out of the ground, and that tiles containing RACM remained on the concrete slab, which would require additional remediation.

68.   Despite representing to DOE, EPA, and Ecology that it would employ the AACM controls in 272E Fabrication building demolition, CHPRC cut corners and ignored necessary controls that would have limited asbestos exposure in order to speed up demolition activities and meet the September 30, 2011 deadline for performance fee awards.

69.   CHPRC then falsely certified to DOE that it demolished the 272E Fabrication Shop in compliance with the Removal Action Work Plan in order to obtain the $230,000 performance award fee associated with the demolition activities.

Original Complaint                                    20

70.    As a result of CHPRC's failure to properly remediate the area, the Government has incurred additional costs to control the migration of asbestos containing materials from the demolition sites and prevent further environmental exposure.

### 3.    *284E Powerhouse, 284W Powerhouse, and 284WB Power Boiler Plant*

71.    CHPRC continued its habit of improperly and inadequately implementing the AACM approach in its demolition of another group of buildings tied to a significant monetary incentive: the 284E Powerhouse, the 284W Powerhouse, and the 284WB Power Boiler Plant.

72.    To earn a performance base fee of approximately $680,000, CHPRC was required to "demolish and dispose" of the 284E Powerhouse, the 284W Powerhouse, and the 284WB Power Boiler Plant by September 30, 2011 in accordance with the Central Plateau Work Plan.

73.    Consistent with all DOE approved demolition work plans, the Central Plateau Work Plan also limited CHPRC's usage of AACM to only those instances where RACM "is inaccessible, removal poses significant worker safety issues, the building/structure is structurally unsound and/or in danger of imminent collapse, or removal requires initiation of demolition activities."

74.    To maintain the demolition schedule, CHPRC management pressured workers to complete abatement of accessible RACM as soon as possible, sacrificing safety for speed.

75.    To further accelerate activities, CHPRC notified EPA, Ecology, and DOE multiple times starting in January 2011 that the 284E Powerhouse and the 284W Powerhouse would be demolished with RACM in place though CHPRC knew accessible RACM had yet to be abated.

76.    Because CHPRC could only employ the AACM in explicitly listed circumstances, CHPRC management overstated the risk that RACM removal posed to workers in order to validate performing demolition activities on the 284W Powerhouse and 284E Powerhouse.

77.    In fact, in the spring and summer of 2011, workers and safety representatives protested the extent to which CHPRC claimed RACM to be inaccessible.

78.    Safety representatives noted that some of the "inaccessible" RACM could be easily reached with scaffolding and therefore properly abated, and that other areas contained no plausible basis to justify use of the AACM.

79.    Nevertheless, CHPRC ignored its workers and safety representatives and knowingly misrepresented to DOE and EPA that the RACM was inaccessible.

80.     Just as with the U Plant Buildings and the 272E Fabrication Shop, CHPRC demolished portions of the 284W Powerhouse and 284E Powerhouse without abating accessible RACM or RACM that became accessible during demolition activities.

81.     In addition, CHPRC demolished the 284E and 284W Powerhouses and the 284WB Power Boiler Plant without implementing key AACM controls promised to DOE, EPA, and Ecology in CHPRC's Central Plateau Work Plan, such as:

   a)     "Breakage of ACM will be minimized, to the extent practical, and ACM debris generated during that day will be containerized for disposal;"

   b)     "The 'National Emission Standards for Hazardous Air Pollutants' (NESHAPs) asbestos standard of 'no visible emissions' from RACM or ACM will be employed;"

   c)     "Potentially contaminated water will be controlled during demolition, impervious surfaces will be thoroughly washed with water following completion of the asbestos-related activities;"

   d)     "Upon the removal of demolition debris, bare soil within the asbestos-related demolition area will be excavated to a minimum depth of 7.64 cm (3 in.) or until no debris is found.  If berms or other run-off controls

1    were used to contain water, they will be removed and disposed of as

2    potentially asbestos-contaminated."

3    82.    Despite its obligation to minimize asbestos debris, CHRPC took few

4    measures to prevent unnecessary asbestos exposure during and after demolition

5    activities.

6    83.    For instance, CHPRC did not pick up asbestos debris on a timely

7    basis–a required activity which would have prevented demolition activities from

8    causing further asbestos breakage and environmental contamination.

9    84.    In fact, at the 284E and 284W demolition sites, workers complained

10    of visible emissions from demolition activities, evidencing CHRPC's failure to

11    properly wet the structure during demolition to prevent the airborne emission of

12    asbestos fibers.

13    85.    Further, as with other demolition sites, CHPRC did not clear away

14    three inches of soil at the 284E, 284W, and 284WB demolition sites and significant

15    amounts of possible RACM remained after CHPRC claimed completion of

16    demolition activities.

17    86.    Relator Millbauer recalls observing dry chunks of RACM, which were

18    left in the field in and near the demolition sites, contrary to AACM requirements

19    for debris handling and removal.

20

21    Original Complaint                    24

87.    In addition, CHPRC failed to close off drains within the 284E demolition site.

88.    In January 2012, inspections confirmed CHPRC's failure to implement the AACM controls at the 284E, 284W and 284WB demolition sites and determined that additional remediation would be required to close these areas.

89.    For the 284E demolition site, immediate confinement controls were required to prevent the further spread of the ACM, including: closing the access road bisecting the area, establishing boundary controls and postings surrounding the powerhouse, applying a fixative to the ACM until the implementation of further corrective actions, and adding additional controls to a nearby work package to alert workers of the potential to encounter asbestos.

90.    For the 284W and 284WB demolition sites, immediate and long term controls were implemented, including boundary controls and postings to inform workers of asbestos dangers located in and around the demolition sites.

91.    Despite representing to DOE, EPA, and Ecology that it would employ the AACM controls in demolishing the 284E Powerhouse, 284W Powerhouse, and 284WB Power Boiler Plant, CHPRC cut corners and ignored necessary controls that would have limited asbestos exposure in order to speed up demolition activities and meet deadlines for performance fee awards.

92.     CHPRC then falsely certified to DOE that it demolished the 284E Powerhouse, 284W Powerhouse, and 284WB Power Boiler Plant in compliance with the Central Plateau Work Plan in order to obtain the $680,000 performance award fee associated with the demolition activities.

93.     As a result of CHPRC's failure to properly remediate the area, the Government has incurred additional costs to control the migration of asbestos containing materials from the demolition sites and prevent further environmental exposure.

### 4.     209E Laboratory

94.     CHPRC continued its pattern of improperly relying on the AACM to avoid performing required RACM abatement activities in demolishing the 209E Critical Mass Laboratory.

95.     To earn a performance award fee of approximately $1.1 million, CHPRC was required to "demolish and dispose" of the 209E Laboratory by September 30, 2011 in accordance with the Action Memorandum for Decontamination, Deactivation, Decommissioning, and Demolition (D4) Activities for 200 East Tier 2 Buildings/Structures, DOE/RL-2010-102, Rev. 0.

96.     In August 2011, CHPRC provided notice to EPA, Ecology, and DOE that it planned to demolish the 209E Laboratory with 35 ft$^3$ of inaccessible RACM left in place because its removal posed a safety risk to workers.

Original Complaint                                              26

97.   Once again workers and safety representatives believed that CHPRC improperly classified RACM at the 209E Laboratory as inaccessible.

98.   On August 30, 2011, workers issued a stop work on 209E Laboratory demolition activities, asserting that much of the "inaccessible" RACM could be removed safely and compliantly prior to demolition.

99.   Though CHPRC management Ruben Trevino made assurances that RACM abatement would be performed safely, workers lacked confidence in Trevino's claims, as he failed to follow through on past assurances made when CHPRC demolished the 284W Powerhouse without removing accessible RACM.

100.   Nevertheless, the Stop Work was lifted without resolving the workers concerns, and CHPRC proceeded to demolish the 209E Laboratory with accessible RACM in place.

101.   In doing so, CHPRC failed to implement required AACM controls, such as:

a)   "Building/structures to be demolished with RACM remaining will be thoroughly and adequately wetted with amended water (water to which a surfactant has been added) prior to demolition, during demolition and during debris handling and loading. To the extent feasible, cavity areas and interstitial wall spaces will be wetted. A fixative or sealant such as 'lockdown' may be used to reduce the potential for fiber and dust generation

during the demolition process.  Additionally, fixative or sealant will be used on demolition debris that will remain undisturbed for greater than 24 hours;"

b)      "Breakage of ACM will be minimized, to the extent practical, and ACM debris generated during that day will be containerized for disposal;"

c)      "The 'National Emission Standards for Hazardous Air Pollutants' (NESHAPs) asbestos standard of 'no visible emissions' from RACM or ACM will be employed;"

d)      "Potentially contaminated water will be controlled during demolition, impervious surfaces will be thoroughly washed with water following completion of the asbestos-related activities;"

e)      "Upon the removal of demolition debris, bare soil within the asbestos-related demolition area will be excavated to a minimum depth of 7.64 cm (3 in.) or until no debris is found.  If berms or other run-off controls were used to contain water, they will be removed and disposed of as potentially asbestos-contaminated."

102.   Despite its obligation to minimize asbestos debris, CHRPC took few measures to prevent unnecessary asbestos exposure during and after demolition activities.

103.   For instance, on November 28, 2011, a Stop Work Order was issued following a visible concrete dust cloud that went beyond the 100 foot demolition boundary surrounding the 209E site.  Workers attributed the visible emissions to ongoing inadequate wetting techniques used during the demolition process.

104.   Further, CHPRC did not pick up asbestos debris on a timely basis to prevent further breakage from demolition activities, and Relator Millbauer recalls observing dry chunks of RACM, which were left in the field in and near the demolition sites, contrary to AACM requirements for debris handling and removal.

105.   Despite representing to DOE, EPA, and Ecology that it would employ the AACM controls in demolishing the 209E Laboratory, CHPRC cut corners and ignored necessary controls that would have limited asbestos exposure in order to speed up demolition activities and meet deadlines for performance fee awards.

106.   CHPRC then falsely certified to DOE that it demolished the 209E Laboratory in compliance with the Action Memorandum and work plans in order to obtain the performance award fee associated with the demolition activities. DOE awarded CHPRC only partial fee because CHPRC did not meet the deadline associated with the performance award.

107.   As a result of CHPRC's failure to properly remediate the area, the Government has incurred additional costs to control the migration of asbestos

Original Complaint                                29

1  containing materials from the demolition sites and prevent further environmental

2  exposure.

3      **C.**    **Inspections Reveal CHPRC Violated Asbestos Control**

4          **Requirements at Other Demolition Sites.**

5      108.   On December 14, 2011, the U.S. EPA Office of Inspector General

6  published "Early Warning Report: Use of Unapproved Asbestos Demolition

7  Methods May Threaten Public Health."

8      109.   The report indicated that the use of unapproved methods for

9  demolition of buildings containing asbestos could jeopardize the health and safety

10  of the public, as "[d]emolition equipment applies mechanical forces that shred the

11  RACM, potentially releasing asbestos fibers into the environment and endangering

12  public health."

13      110.   Given the seriousness of the report, EPA Administrator Lisa Jackson

14  issued an immediate initial response to Inspector General ("IG") Arthur A. Elkins,

15  Jr. assuring the IG that it had begun investigations into the allegations and would

16  take "whatever steps are necessary to protect the health of anyone who might be

17  exposed."

18      111.   On January 12, 2012, a month after EPA issued its Early Warning

19  Report, a Stop Work Order was initiated on all Hanford Site demolition activities

20  using the AACM approach.

21  Original Complaint                     30

112.   Relator Millbauer attended several site inspections that occurred in the weeks following the stop work, including an inspection on January 31, 2012 wherein an asbestos inspection team identified ACM of various shapes and sizes ranging from one quarter inch to four inches, corrugated transite asbestos siding, roofing, and floor tile, and fibrous cloth-like material in and around buildings 284-E, 284-W, 272-E, 209-E, the "Industrial 7" buildings, including 272-W and 277-W, and buildings in the 100K Area, including 1720K, 1717K, 110KW, and 182K—all of which were tied to performance award fees.

113.   The inspection team additionally found that 40 percent of the 200 West steam lines had exposed friable asbestos with about 5 percent presenting an imminent potential danger to personnel.

114.   As a result of the team's findings, Mission Support Alliance ("MSA") Director of Environment, Health and Safety initiated "immediate actions to include wrapping and posting the areas posing the greatest risk to 200 West area personnel."

**D.      EPA and Ecology Instruct CHPRC to Stop Work and Cease Use of the AACM.**

115.   The following month, on March 1, 2012, the Region 10 EPA Director issued a stop work order on all asbestos work for all contractors on the Hanford

site, which extended to any work that would disturb asbestos containing material in all buildings, facilities, and areas.

116.   That same day, EPA and Ecology revoked its concurrence on previous Action Memoranda and associated documents which enabled CHPRC to employ alternate asbestos control methods, thereby requiring CHPRC to comply with 40 C.F.R. § 61, Subpart M, in performance of all future deactivation and demolition activities.

117.   In subsequent inspections, it was determined that the demolition work conducted by CHPRC created an additional 35 sites where asbestos was released or suspected to have been released to the soil, which require additional investigation and possible remediation, "in large part because of the manner in which demolition work was performed."

## COUNT I

### False Claims Act

### 31 U.S.C. §§ 3729(a)(1) and (a)(2)

118.   The allegations of paragraphs 1 through 117 are realleged as if fully set forth herein.

119.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

Original Complaint                                    32

120.   Through the acts described above, Defendant through its officers, agents, and employees, knowingly presented or caused to be presented false or fraudulent claims, records, and statements for payment or approval to the United States.

121.   Through the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to pay or approve such false or fraudulent claims.

122.   Each time Defendant submitted a request for payment or approval to the United States in conjunction with the AACM and its D4 Activities certifying compliance with contractual requirements, Defendant caused the presentation of a false or fraudulent claim.   In addition, each monthly ARRA cost summary containing an express certification of compliance with contractual requirements represents a false or fraudulent claim.

123.   Defendant acted knowingly; that is, Defendant possessed actual knowledge that the claims were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the claims; or acted with reckless disregard for the truth or falsity of the claims.

124.   The United States made payments and approvals to Defendant for D4 operations and the use of the AACM in reliance on false and fraudulent records, statements, and claims made or caused to be made by Defendant.

125. Had the United States known the true nature and extent of Defendant's false and fraudulent records, statements, and claims, the United States would not have made payments to Defendant.

126. By reason of Defendant's acts, the United States has been damaged in the amount of hundreds of millions of dollars.

## V.    JURY REQUEST

127. Relator requests a trial by jury.

## VI.    PRAYER FOR RELIEF

128. WHEREFORE, Plaintiff, United States of America, through Relator, request the Court enter the following relief:

a.    That Defendant be ordered to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

b.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

d.    That Relator be awarded all costs of this action, including attorneys fees and expenses; and

e.      That Relator recovers such other relief as the Court deems just and proper.

All of which is respectfully submitted this 23rd day of March, 2015.

EYMANN ALLISON HUNTER JONES P.S.

Richard C. Eymann, WSBA #7470
2208 W. Second Avenue
Spokane, Washington  99201
Telephone:  (509) 747-0101
Facsimile:    (509) 458-5977
E-mail:  eymann@eahjlaw.com


Hugh P. Lambert *(pro hac vice pending)*
Emily C. Jeffcott *(pro hac vice pending)*
Cayce C. Peterson *(pro hac vice pending)*
Chathan S. Mangat *(pro hac vice pending)*
THE LAMBERT FIRM, PLC
701 Magazine Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-1750
Facsimile:    (504) 529-2931
E-mail:      hlambert@thelambertfirm.com
             ejeffcott@thelambertfirm.com
             cpeterson@thelambertfirm.com
             cmangat@thelambertfirm.com


*Attorneys for Relator*

Original Complaint                    35